**AUTO CHANNEL, INC.,
et al., Plaintiffs,**

v.

**SPEEDVISION NETWORK,
LLC, et al., Defendants.**

**No. CIV. A. 3:97–CV–38–H.**

United States District Court,
W.D. Kentucky,
Louisville Division.

May 2, 2001.

James E. Morreau, Jr., Kruger, Schwartz & Morreau, Louisville, KY, for Plaintiffs.

K. Gregory Haynes, Wyatt, Tarrant & Combs, Louisville, KY, Burt A. Braverman, Sandra Greiner, T. Scott Thompson, Cole, Rayvid & Braveman, Washington, D.C., for Speedvision Network, LLC, defendant.

Janet P. Jakubowicz, John K. Bush, Greenebaum Doll & McDonald, Louisville, KY, Timothy J. O'Rourke, Scott D. Dailard, Dow, Lohnes & Alberson, PLLC, Washington, D.C., for Cox Communications, defendant.

John S. Reed, II, Reed, Weitkamp, Schell, Cox & Vice, Louisville, KY, Dana B. Klinges, Robert Goldstein, Daniel D. McClain, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, Todd C. Schiltz, Wolf, Block, Schorr & Solis–Cohen, Wilmington, DE, M. Norman Goldberger, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for Comcast Corporation, defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Plaintiffs, Auto Channel, Inc., Robert Gordon, and Marco Rauch, developed a concept for a new cable television channel, The Auto Channel (or TACH), designed to capture the American male's interest in moving vehicles. They sought investment and, just as important, access to cable broadcasting systems. The current lawsuit distills down to three basic complaints: Defendants Comcast Corporation ("Comcast") and Cox Communications, Inc. ("Cox") unlawfully appropriated Plaintiffs' trade secrets, violated contractual agreements, and delayed the Auto Channel's launch in order to favor a competing channel. After Plaintiffs engaged in extensive discovery, Defendants have moved for summary judgment on the claims remaining. The Court has thoroughly discussed the relevant legal issues and evidence with the parties at a conference. For the reasons set forth, the Court concludes that the evidence and law cannot sustain any of Plaintiffs' remaining claims.

I.

In the late 1980's, Plaintiffs began developing the concept of the Auto Channel, a cable channel devoted to motor vehicles. They produced sixty-eight pilot shows to field test their ideas and evaluate audience interest. After putting together a business plan in 1993, Plaintiffs sought financing by presenting their plan to a wide variety of potential backers. After numerous presentations but no firm funding commitments, Plaintiffs sent a summary of their business plan and a demonstrative videotape to the top cable operators in the country, including Cox and Comcast. Cox expressed an interest in Plaintiffs' ideas and met with them three times during the next year. Cox had the ability to provide both financing and access to cable broadcasting systems. During these conversations, Plaintiffs provided Cox additional information, such as the identification of programming available for possible licensing. Cox made many optimistic statements that a deal would be reached. In September 1994, however, Cox informed Plaintiffs that it would not invest in Auto Channel. Subsequently, Cox and Comcast invested in Speedvision, a cable channel that shares many attributes with the proposed Auto Channel.

Plaintiffs then sued, claiming that the Defendants unlawfully hindered Plaintiffs business' opportunities and misappropriated proprietary information. In a prior memorandum and order, the Court dismissed several claims and defendants. Since that time, the parties have completed exhaustive discovery. The remaining Defendants now move for summary judgment on the surviving claims. Currently before the Court are Plaintiffs' remaining causes of actions: unfair competition and violation of the Kentucky Uniform Trade Secrets Act against both Cox and Comcast, and breach of contract, breach of covenants of good faith and fair dealing, promissory estoppel, fraud, concealment, breach of fiduciary duty, and idea misappropriation against Cox.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The issue is whether the evidence submitted presents a sufficient disagreement about the material facts so that submission to a jury is necessary, or whether the evidence is so one-sided that a party must prevail as a matter of law. *Id.* at 251–52, 106 S.Ct. 2505. Throughout this opinion, the Court construes the facts in the light most favorable to Plaintiffs. *See Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 94, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994).

## II.

■ Plaintiffs remaining claims all arise under state law. In 1990, Kentucky passed the Kentucky Uniform Trade Secrets Act ("KUTSA") with only minor changes in the uniform law. *See* Denise H. McClelland & John L. Forgy, *Is Kentucky Law "Pro–Business" in its Protection of Trade Secrets, Confidential and Proprietary Information?* 24 N. KY. L. REV. 229, 230 (1997); KENT. REV. STAT. ANN. § 365.880 (Michie 2000); UNIFORM TRADE SECRETS ACT 14 U.L.A. 433 (1990). KUTSA establishes a statutory scheme governing the definition, protection, and penalties for misappropriation of trade secrets. In spite of KUTSA's passage over ten years ago, no Kentucky court has published a decision interpreting or applying the law. Because KUTSA is a uniform law, however, decisions in other jurisdictions provide guidance for its application and construction. *See* KENT. REV. STAT. ANN. § 365.894 ("[KUTSA] shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [KUTSA] among states enacting it.").

■ As part of the statutory scheme, KUTSA replaces all conflicting civil state law regarding misappropriation of trade secrets except for those relating to contractual remedies. KENT. REV. STAT. ANN. § 365.892 (KUTSA "replaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret," but KUTSA "shall not affect: (a) Contractual remedies, whether or not based upon misappropriation of a trade secret"); *see also Servicetrends, Inc. v. Siemens Med. Sys., Inc.*, 870 F.Supp. 1042, 1073 (N.D.Ga.1994) (holding that equivalent provision in Georgia law "supercedes other civil remedies for misappropriation of a trade secret").

At oral argument on the pending motions, Plaintiffs argued that KUTSA only applies to information that meets the statutory definition of trade secrets and that if

commercially valuable information, for whatever reason, does not meet the statutory definition, then common law misappropriation remedies remain. While a selective reading of KUTSA might seem to support such an argument, the history, purpose, and interpretation of the statute absolutely precludes it.

The Uniform Trade Secrets Act arose out of an increasingly nebulous interaction between common law trade secret protection and patent law. The drafters state:

> The Uniform Act codifies the basic principles of common law trade secret protection, preserving its essential distinctions from patent law.

> . . . . .

> The contribution of the Uniform Act is substitution of unitary definitions of trade secret and trade secret misappropriation, and a single statute of limitations for various property, quasi-contractual, and violation of fiduciary relationship theories of noncontractual liability utilized at common law.

PREFATORY NOTE TO UNIFORM TRADE SECRETS ACT, 14 U.L.A. 433, 434–35 (2000). The Uniform Trade Secrets Act also arose to create a uniform business environment that created more certain standards for protection of commercially valuable information. *See, e.g., Reingold v. Swiftships, Inc.*, 210 F.3d 320, 322 (5th Cir.2000).

The "Effect on Other Laws" provision of the Uniform Trade Secrets Act clearly states that the law "replaces conflicting" remedies for violations of a trade secret. Plaintiffs' proposed reading of that statute would render the word "replace" a nullity. In every instance where a plaintiff could not meet the statutory requirements of the Uniform Act, the court would be forced to re-analyze the claim under the various common law theories. *See, e.g., Weins v.*

*Sporleder*, 1999 SD 10, 605 N.W.2d 488, 491–92 (S.D.2000) (citing cases where "numerous courts have specifically found that tort claims such as fraud, unfair competition, and breach of fiduciary duty are preempted by the Uniform Trade Secret Act"). Such a result would undermine the uniformity and clarity that motivated the creation and passage of the Uniform Act. For our purposes, therefore, KUTSA replaces other law relating to the misappropriation of trade secrets, regardless of whether the Plaintiffs demonstrate that the information at issue qualifies as a trade secret. *See, e.g., Composite Marine Propellers v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir.1992).

■ Importantly, however, KUTSA does not preempt all causes of action that have to do with trade secrets. If, as the *Weins* court identified, the plaintiff demonstrates a further factual basis for fraud or deceit that has as an element the use of trade secrets, those causes of action are not necessarily preempted. *See Weins*, 605 N.W.2d at 492.

### III.

Since KUTSA replaces conflicting law regarding misappropriation of trade secrets, this Court must first examine each of Plaintiffs' noncontractual claims and determine whether the claim seeks a remedy for the misappropriation of trade secrets. If so, then KUTSA applies. If KUTSA does not completely replace the claim, then this Court will examine the claim separately. Finally, this Court will address Plaintiffs' claims under KUTSA.

### A.

■ Count ten of the complaint charges Defendants with unfair competition. Kentucky has only recognized the claim of unfair competition in the realm of trademarks and defines unfair competition "as

passing off, or attempting to pass off, upon the public the goods or business of one man as being the goods or business of another." *Newport Sand Bank Co. v. Monarch Sand Min. Co.,* 144 Ky. 7, 137 S.W. 784, 785 (1911). The Restatement of Unfair Competition adopts a broader view, imposing liability for unfair competition when harm results from deceptive marketing, trademark infringement, or appropriation of intangible trade values, including trade secrets. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1(a) (1995).

Here, Plaintiffs' only potential unfair competition claims arise from the misappropriation and use of Plaintiffs' trade secret information by Defendants. Thus, even under the broadest possible interpretation of Kentucky law, Plaintiffs' unfair competition claim would arise from the misappropriation of trade secrets. This claim is precisely the type replaced by KUTSA.

### B.

■ Count nineteen of the complaint alleges idea misappropriation. KUTSA provides the only avenue for claims based on idea misappropriation in Kentucky. *See, e.g., Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir.1992) (referencing preemption clause of Illinois Trade Secrets Act and stating "Illinois has abolished all common law theories of misuse of such information. Unless defendants misappropriated a (statutory) trade secret, they did no legal wrong." (citation omitted)). KUTSA, likewise, controls Plaintiffs' idea misappropriation claim.

### C.

■ This Court now turns to Plaintiffs' claims that are not completely preempted by KUTSA. Count thirteen of the complaint makes several different allegations based in contract. KUTSA does not replace contractual remedies. *See* KENT. REV. STAT. ANN. 365.892. However, paragraph 383 of the complaint claims relief under the doctrine of quasi-contract. Despite using the language of contract, such a claim is restitutionary in nature. Therefore that portion of count thirteen is governed by KUTSA. *See, e.g., Glasstech, Inc. v. TGL Tempering Systems, Inc.,* 50 F.Supp.2d. 722, 730–31 (N.D.Ohio 1999) (holding quasi-contract claim preempted by the Ohio Uniform Trade Secrets Act); *Union Central Life Ins. Co. v. Glasscock,* 270 Ky. 750, 110 S.W.2d 681, 686 (1937) (stating that "[t]he duty which thus forms the foundation of a quasi-contractual obligation is frequently based on the doctrine of unjust enrichment").

### 1.

■ Plaintiffs' remaining contract claims rely upon an express or implied contract with Cox. Unfortunately, no written contract ever governed Plaintiffs' relationship with Cox. Nevertheless, Plaintiffs claim that the negotiations with Cox created an express contract. Plaintiffs point to the repeated oral statements of Cox throughout the negotiation process expressing tremendous enthusiasm for the future. Optimism alone, however, cannot create binding obligations. In Kentucky, Plaintiffs must show that an actual agreement existed between the parties with clear and convincing evidence. *Industrial Equip. Co. v. Emerson Elec. Co.,* 554 F.2d 276, 288 (6th Cir.1977). While the agreement need not cover every conceivable term of the relationship, it must set forth the "essential terms" of the deal. *See, e.g., Brooks v. Smith,* 269 S.W.2d 259, 260 (Ky. 1954) (holding "[s]ince the parties had not yet agreed on all the essential terms, they had not entered into a binding contract").

■ Plaintiffs have put forth no evidence to show agreement on the essential terms of the purported contract. The record is absolutely silent on the price, ownership, governance, form, and timing of the relationship in addition to the duration, scope, and geographic limitation of any non-compete agreement. Each of these items would be essential in a deal of this sort. An express agreement is impossible without some agreement on these terms. Plaintiffs' attempts to infer these terms based on unsupported assumptions cannot rise to the level of clarity necessary to support a finding of a contract by clear and convincing evidence. *See Industrial Equip. Co.*, 554 F.2d at 288.

Plaintiffs' own description of the contract's claimed terms demonstrate the absolute lack of agreement. In their complaint, the Plaintiffs state the contract obligated Cox "to fund the TACH network" and "refrain from engaging in competition with plaintiffs in the Cable Television Programming Market as it pertained to the Motorized Vehicle Network Market." However, in their response to Cox's motion for summary judgment, Plaintiffs describe the agreement as one that "if TACH disclosed its confidential, proprietary information to Cox: (a) Cox would not create or otherwise become involved in a competing network; and (b) if Cox invested in an auto-related channel, it would be ·TACH." Elsewhere in their response, Plaintiffs assert the contract required Cox "to invest $50,000,000 in exchange for 50% interest in The Auto Channel and commitment to carry TACH on its local cable stations." Finally, when arguing these motions to the Court, counsel for Plaintiffs described

the contract as one that provided if Cox invested in any motor vehicle channel, Cox would invest $50,000,000 in the Auto Channel for a 50 percent interest either in the form of equity or debt. After extensive discovery, Plaintiffs have not identified any evidence to support these descriptions of the terms of the alleged contract. Indeed, Auto Channel's President admitted in his deposition that, "[t]here were no terms stated" for the agreement with Cox. Internal memoranda from Plaintiffs indicated that "as of this moment we have yet to close a deal with [Cox]" and that the Plaintiffs needed to "[g]ive Cox some time."

Absent *any* evidence to the contrary, such statements by Plaintiffs preclude a finding of a contract between Cox and Plaintiffs. The undisputed facts fall far short of creating an express or implied contract as a matter of law. Plaintiffs' claims based on contract must be dismissed.[1]

### 2.

■ Count fourteen alleges that Cox violated a covenant of good faith and fair dealing with Plaintiffs. Such a covenant, however, only arises from a contract. *See, e.g., Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky.1991) (stating that "[i]n every contract, there is an implied covenant of good faith and fair dealing"); Richard A. Lord, WILLISTON ON CONTRACTS § 38:15 (2000). In the absence of a contract, no such covenant applies and the Court will therefore dismiss this claim.

### D.

■ In count fifteen, Plaintiffs claim that they relied on Cox's promise not to compete with them and seek damages on

---

1. Because this Court finds that the undisputed facts simply do not support the existence of any agreement between the parties, oral or otherwise, it need not reach the applicability of the statute of frauds or whether the alleged contract was an unenforceable agreement to agree.

the theory of promissory estoppel. To prevail on a claim of promissory estoppel, Plaintiffs must show 1) a clear promise 2) that is reasonably expected to induce action. *See McCarthy v. Louisville Cartage Co., Inc.,* 796 S.W.2d 10, 11–12 (Ky.App. 1990) (citing cases demonstrating Kentucky's adoption of § 90 of Restatement (Second) of Contracts). In addition, such a promise is binding "if injustice can be avoided only by enforcement of the promise." Restatement (Second) Of Contracts § 90(1) (1981).

This claim is a step removed from the implied contract allegation. Here, Plaintiffs seek to enforce a promise not to compete with Plaintiffs. In reliance of this promise, Plaintiffs allege they spent considerable time and money pitching the idea to Cox. In their summary judgment responses, Plaintiffs also claim that the promises induced them to disclose trade secrets but such claims were not identified in their complaint and, in any event, would be preempted by KUTSA. The Court will, therefore, only consider their original promissory estoppel claim.

■ Plaintiffs cannot prove any element of their promissory estoppel claim. The promise made by Cox cannot serve as the basis for a promissory estoppel claim because it did not reasonably induce reliance on the part of the Plaintiffs. If, for example, the only evidence showed that Cox reviewed Plaintiffs materials, seriously considered the proposal, but ultimately declined to invest, then Plaintiffs would have absolutely no conceivable claim arising from this promise not to compete. Plaintiffs were working hard to sell their idea to many potential investors, both before and after Cox made this alleged promise. While this promise may have influenced Plaintiffs decisions in some ways, it did not give Plaintiffs an enforceable claim if Cox decided not to invest in the Auto

Channel. In short, Cox never promised to do business with Plaintiffs.

Plaintiffs also fail to show that the promise was sufficiently clear and definite. Plaintiffs, in essence, seek to transform a subsequent decision by Cox to invest in Speedvision into a cancellation penalty for the Cox–Auto Channel negotiations. Whatever promise Cox may have made, it was not sufficiently clear and definite to give Plaintiffs an enforceable right as to future conduct after Cox had declined to invest in the Auto Channel. Unlike cases in the heartland of promissory estoppel where the doctrine is invoked, for example, to require a subcontractor to honor a bid submitted to a contractor who was then awarded the contract, the promise here was not sufficiently definite to cover conduct after the parties abandoned their negotiations. *See, e.g., Leila Hosp. and Health Ctr. v. Xonics Med. Sys., Inc.,* 948 F.2d 271 (6th Cir.1991).

Finally, even if Plaintiffs had shown that the promise was sufficiently clear and definite and induced reasonable reliance, they have not shown that injustice would be avoided only be enforcement. First, assuming that Cox's current involvement in Speedvision competes with Plaintiffs, enforcing the noncompete promise now would give no benefit to Plaintiffs, but merely hinder Cox's current business. While Plaintiffs could perhaps strike a bargain with Cox to permit Cox to continue with Speedvision, such a secondary benefit does not enter the current calculus. Second, as discussed above, enforcing the promise would not alter the parties business relationship. Cox did not promise to do business with Plaintiffs and, in fact, the promise in no way relates to the business dealings between Cox and Plaintiffs. The injustice to Plaintiffs simply does not depend on Cox's business decisions after Cox and Plaintiffs parted ways. Plaintiffs'

promissory estoppel claim must be dismissed.

### E.

■ Count sixteen of the Plaintiffs' complaint seeks recovery for fraud and misrepresentation. Count seventeen alleges concealment and non-disclosure. The concealment and nondisclosure claims merely restate the fraud claims with more specificity. Plaintiffs claim that Cox fraudulently induced Plaintiffs to turn over proprietary information and delay distribution of the Auto Channel after Cox had decided not to invest in Auto Channel. KUTSA specifically identifies misrepresentation as an improper means of obtaining trade secrets. KENT. REV. STAT. ANN. § 365.880(1) (" 'Improper Means' includes theft, bribery, misrepresentation. . . ."). Therefore, Plaintiffs' claim that Cox misrepresented facts to induce them to turn over trade secrets must be analyzed under KUTSA.

■ The remainder of Plaintiffs' fraud and concealment claims assert that Cox improperly delayed Auto Channel's distribution in order for Speedvision to be the first automotive themed channel on the air. Specifically, Plaintiffs claim that during the time that Cox was negotiating with Speedvision, Cox fraudulently stated facts so that Auto Channel would not take their concept elsewhere. However, statements concerning promises to perform in the future cannot support a fraud claim. Only Cox's misrepresentations of present or pre-existing facts can give rise to liability. *Filbeck v. Coomer*, 298 Ky. 167, 182 S.W.2d 641, 643 (1944). Thus, Cox's statements only represented false facts if they were, indeed, negotiating with Speedvision simultaneously with the Auto Channel.

■ By letter dated September 16, 1994 Cox terminated its negotiations with the Auto Channel. Extensive discovery has produced evidence of only one conversation between anyone at Cox and anyone at Speedvision prior to that date. The May 1994 conversation concerned whether Cox would be interested in any programing investments with one of the principals of Speedvision. No evidence suggests that the conversation touched on programming relating to vehicles or automobiles. Evidence of this single preliminary May 1994 conversation, without more, simply does not rise to the level of clear and convincing proof necessary to show fraud under Kentucky law. *See Sanford Construction Co. v. S & H *Contractors, Inc.*, 443 S.W.2d 227, 235 (Ky.1969). Even if that May 1994 conversation planted the concept of Speedvision in Cox's mind, subsequent encouragement and optimism about Cox's potential with Auto Channel does not rise to the level of actionable fraud. Therefore, these fraud claims do not rise to the level recognized by Kentucky law and will therefore be dismissed.

### F.

Count eighteen of Plaintiffs' complaint alleges breach of fiduciary duty. Again, to the extent those claims involve disclosure of trade secrets, KUTSA governs these claims. Any remaining claims based on a breach of fiduciary duty require, obviously, the existence of such a duty.

■ The undisputed facts do not support the inference that Cox owed Plaintiffs a fiduciary duty. Though no comprehensive definition clearly delineates the exact predicates for a finding of fiduciary duty, certain elements are essential. There must be a relationship "founded on trust or confidence reposed by one person in the integrity and fidelity of another" and that relationship must involve "an undertaking in which a duty is created in one person to act primarily for another's benefit." *Steel-*

*vest Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky.1991). At no point in the negotiations between Cox and Plaintiffs did a duty arise obligating Cox to act primarily for Plaintiffs' benefit. In spite of the different financial worth of the parties, all involved knew what was at stake at the negotiation table and were each looking out for their self interest. If the relationship had become sufficiently definite as to warrant equitable recognition, then perhaps this Court could properly infer a fiduciary relationship even where all of the details of the undertaking had not been finalized. *See, e.g., O'Bryan v. Bickett*, 419 S.W.2d 726, 729 (Ky.1967) (equitably recognizing arrangement where "parties had agreed on basic framework of a 'deal,'" including "a specific tract of land at a specific price."). Where, as here, the relationship had not risen to the level of equitable recognition, then this Court cannot find such a fiduciary duty.

## IV.

The Court will now consider Plaintiffs' KUTSA claims. KUTSA provides civil remedies against those who misappropriate trade secrets. To prevail under KUTSA, Plaintiffs must show both misappropriation and that the information misappropriated qualifies as trade secrets under KUTSA. KENT. REV. STAT. ANN. § 365.880; *see, e.g., Composite Marine Propellers, Inc., v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir.1992); *Web Communications Group v. Gateway 2000, Inc.*, 889 F.Supp. 316, 319–21 (N.D.Ill.1995). If Plaintiffs fail to satisfy either element, then their KUTSA claim fails as a matter of law.

To begin, this Court notes that Plaintiffs spill much ink describing the fact they were the only group that had actually tested their ideas for an automotive-centered cable channel and that this experience gives their ideas some sort of special status. This distinction is absolutely irrelevant under the law. KUTSA protects economically valuable ideas that are not generally known, readily ascertainable, and kept reasonably secret. KENT. REV. STAT. ANN. § 365.880. The statute draws no distinction between time-tested, novel, or pie-in-the-sky ideas.

### A.

To qualify as a trade secret, the information must "derive independent economic value," not be "readily ascertainable by proper means," and be the "subject of efforts that are reasonable under the circumstances to maintain its secrecy." KENT. REV. STAT. ANN. § 365.880(4). Plaintiffs identify several elements of their idea for the Auto Channel that potentially qualify for protection under KUTSA. In their complaint, they assert that the type, arrangement, and sources of the programming; the 65%/35% mixture of live and taped programming; the repetition of a structure format; a "focal point" show; the use of celebrity "on-air talent;" news coverage of automotive events; coverage of specific automotive-focused events; "home shopping segments;" "editorial and promotional relationships" with other automotive media and companies; and the financial model and business plan are all protectable trade secrets. In addition, in their response to summary judgment, they identify the identification of a "target market," the use of "manufacturer supplied long-form advertising," the offer of "increased advertising time to local cable operators," and the "strategy for gradually increasing coverage of 'Live Racing' events over time" qualify as additional, protectable trade secrets.

The Court will assume, for this analysis, that these concepts derive independent economic value, both individually and as a

collection. Independent of any actions by Plaintiffs, however, many of these concepts are clearly readily ascertainable through proper means. *See, e.g., Western Med. Consultants, Inc. v. Johnson,* 80 F.3d 1331, 1337 (9th Cir.1996) (holding information "complied from various generally known and accessible sources" does not qualify for protection under Oregon Trade Secrets Act). Plaintiffs, for example, simply cannot claim that a prospective cable channel about all things automotive having young and middle aged men as a target audience is not readily ascertainable by other means.

### B.

■ Plaintiffs' own actions, however, obviate the need for this Court to parse their list of trade secrets and determine which might have been otherwise ascertainable. Plaintiffs published all but one of these concepts in their pilot episodes and in the promotional materials they sent, unsolicited, to nearly every major player in the cable industry. As such, Plaintiffs' own actions made the information readily ascertainable by many people directly and indirectly through proper means. Plaintiffs made only the most incidental effort to keep the information secret under the circumstances.

Their promotional materials were not marked with labels designating the information confidential or proprietary. *See, e.g., Alagold Corp. v. Freeman,* 20 F.Supp.2d 1305, 1315–16 (M.D.Ala.1998) (denying trade secret protection to materials not "marked 'confidential' "); *Allied Supply Co., Inc., v. Brown,* 585 So.2d 33, 36 (Ala.1991) (holding that plaintiff had not "made reasonable efforts to maintain the secrecy" of the information because, in part, the information was "not marked 'confidential' "); *Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514, 66 Cal.Rptr.2d 731, 736

(1997) (holding "[w]hile labeling information 'trade secret' or confidential does not conclusively establish that the information fits this description, it is nonetheless an important factor in establishing the value which was placed on the information and that it could not be readily derived from publicly-available sources." (citations omitted)).

At no point did Plaintiffs require potential investors to agree to a nondisclosure agreement, nor did they ever send a nondisclosure request along with the materials. *See, e.g., Alagold Corp.,* 20 F.Supp.2d at 1315–16 (finding lack of requirement "to execute a confidentiality agreement" an important factor in precluding trade secret status); *Religious Tech. Ctr. v. Netcom On-Line Communication Serv., Inc.,* 923 F.Supp. 1231, 1254 (N.D.Cal.1995) (concluding information sufficiently protected because, among other precautions, plaintiff required "confidentiality agreements for all of those given access to the materials"); *Web Communications Group, Inc. v. Gateway 2000, Inc.,* 889 F.Supp. 316, 320 (N.D.Ill.1995) (rejecting trade secret protection where plaintiff did not "have a nondisclosure or other confidentiality agreement" with defendant). The only nondisclosure agreement entered into came about at the insistence of a potential investor, CBS, and does not apply to the disclosures made to Cox or Comcast.

In any analysis of this sort, no one factor is determinative. Every circumstance must be considered on its merits. However, here, no substantial factor suggests that these materials qualify as trade secrets. Instead, all these circumstances convincingly preclude any claim under KUTSA for the information in the pilot episodes and the unsolicited business plans since those ideas do not qualify as trade secrets. *See, e.g., Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.,* 909

F.Supp. 1353, 1359 (C.D.Cal.1995) (holding "it is clear that an unprotected disclosure of the holder's secret terminates the existence of the trade secret"); *Web Communications Group*, 889 F.Supp. at 320 (declining to extend trade secret protection where plaintiff "disclosed either dummies or specifications for the [project] to paper suppliers and printers, including a ... competitor" without confidential designations); *Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*, 845 F.Supp. 356, 370 (E.D.Va.1994) (holding that "[t]rade secret rights do not survive when otherwise protectible information is disclosed to others, such as customers or the general public, who are under no obligation to protect its confidentiality" (quotations and citations omitted)).

### C.

▮ Plaintiffs only disclosed the list identifying potential sources for taped programming to Cox, so that claim on that potential trade secret requires more careful analysis.

Even when they provided this list to Cox, Plaintiffs did not obtain a nondisclosure agreement though Cox made some assurances that they would not use the information for any purposes other than to evaluate Plaintiffs' proposal. Plaintiffs provided Cox with a sample list of five to ten percent of their potential programming. This sample list identified the material by program title, a brief description, number of episodes, and program length. In total, the sample list identified 405 titles with over eleven hundred hours of programming. The list did not identify who held the licensing rights to the programming, merely that the program existed. In our case, Plaintiffs' extensive disclosure of supposedly trade secrets without a nondisclosure or confidentiality agreement and the limited nature of that information prevents the list as qualifying as a trade secret under KUTSA. Even if the Court assumes for this analysis that the list qualifies as a trade secret under Kentucky law, Plaintiffs still must show misappropriation.

Of those 405 titles identified, Plaintiffs claim that Defendants actually licensed twenty-seven titles, around five to ten percent of the sample list. Plaintiffs, however, do not connect the disclosure of the sample list that merely identified program titles with the licensing of the programs which required knowledge of the license holder's identity and location. Defendants affirm that none of the individuals responsible for licensing programs at Speedvision ever saw or used the Plaintiffs' sample list. After extensive discovery, Plaintiffs only identify the licensed programs and claim, in essence, that the overlap demonstrates a per se violation of KUTSA. Merely because Plaintiffs discovered or assembled information before other entities does not prevent the other entities from using similar information so long as it was independently discovered or created. Plaintiffs must have evidence from which a reasonable jury could find that under KUTSA, Defendants misappropriated their ideas and did not independently discover these licensing opportunities. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992) (holding that plaintiff "must establish" that the trade secrets were "misappropriated (that is, stolen from it rather than developed independently or obtained from a third source)"). In the face of sworn statements from Defendants, Plaintiffs must identify some act of misappropriation regarding the list, not just a result that could just as easily have been achieved by independent efforts. In addition, the programming list provides particularly poor support for a per se misappropriation argument because of the small percentage of overlap and the absence of

very significant information, such as the identification of the license holder, from the disclosed list. Finally, the license holders of the programming have significant economic incentives to distribute information about the potential availability of their programs.

Plaintiffs also claim that the mere knowledge that so many hours of programming could be assembled is a protectable trade secret. Irrespective of whether the knowledge that such a list existed could be a trade secret, the existence of this programming was the core of Plaintiffs' business model that was widely distributed as part of their search for funding. Therefore, Plaintiffs' last potential KUTSA claim must also fail.

### D.

Plaintiffs justifiably assert that they worked hard to develop their concept of an automotive cable channel. Defendants gave Plaintiffs some hope for badly needed financing and exposure to make their dreams come true. One must assume that Plaintiffs were led-on by some of Defendants' words and actions. However, all of these misunderstandings, deceptions, and disappointments must be carefully examined to determine whether the law provides a remedy for the natural rough and tumble consequences of the business world. This examination is particularly important in view of Kentucky's comprehensive legislative overhaul of common law trade secret claims.

In this case, the Court is convinced that no remedy exists. This is true even though Plaintiffs may have had a better and certainly more maturely developed cable concept. However, they attained no contractual protection. Nor could they or did they adequately protect whatever unique and valuable concepts that they may have developed. Despite Plaintiffs'

many allegations, the evidence of any actionable wrongdoing is too sparse to support the claimed courses of action. Despite having every opportunity to develop adequate claims, Plaintiffs have been unable to do so. Defendants are entitled, therefore, to dismissal of these claims.

The Court will issue an order consistent with this Memorandum Opinion.

### ORDER

Defendants have moved for summary judgment on Plaintiffs' remaining claims. The Court has reviewed the evidence and filed a Memorandum Opinion. For the reasons set forth in that Memorandum Opinion and the Court being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motions for summary judgment are SUSTAINED and Plaintiffs' complaint is DISMISSED WITH PREJUDICE.

This is a final and appealable order.